Gerald Singleton (SBN 208783)
Ross J. Peabody (SBN 98190)
SINGLETON LAW FIRM, APC
857 E. Main Street
Ventura, California 93001
Tel:    (619) 771-3473
Fax:    (619) 255-1515
gerald@slffirm.com
ross@slffirm.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT OF CALIFORNIA

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM SMEDLEY | Case No. |
| Plaintiff, | |
| v. | **PLAINTIFFS ORIGINAL COMPLAINT** |
| CARNIVAL CORPORATION, and PRINCESS CRUISE LINES LTD., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

COME NOW, Plaintiff William Smedley, by and through his undersigned counsel, and file as his Plaintiff's' Original Complaint and Jury Demand against Defendant, CARNIVAL CORPORATION (hereinafter referred to as "CARNIVAL"), and PRINCESS CRUISE LINES LTD. (hereinafter, "PRINCESS"), and would respectfully show the Court as follows:

### I.
### PARTIES

1.    Plaintiff William Smedley is sui juris, is a citizen and resident of Dillsburg, York County, Pennsylvania, and was a passenger onboard the Carnival Cruise Line's Diamond Princess Cruise which departed Singapore on January 6, 2020.

PLAINTIFF'S ORIGINAL COMPLAINT

2.      **Carnival Corporation** (hereinafter "Carnival") is a Panamanian corporation, registered with the California Secretary of State and authorized to do business in the State of California, which has as its principal place of business in Miami, Dade County, Florida. The action is being filed in this Court pursuant to the terms and conditions of the Passenger Contract issued by Defendant, Carnival Corporation and/or its subsidiary, Defendant Princess Cruise Lines Ltd. **Carnival Corporation** may be served with process in this matter by serving its registered agent for the service of process, **CT Corporation System, 818 W. 7th Street, Suite 930, Los Angeles California, 90017**.

3.      **Princess Cruise Lines, Ltd**. (hereinafter "Princess", and referred to along with Carnival as "Defendants") is incorporated in Bermuda, registered with the California Secretary of State to do business in the state of California, and has its with its principal place of business in Santa Clarita, California. The action is being filed in this Court pursuant to the terms and conditions of the Passenger Contract issued by Defendant, Princess Cruise Lines, Ltd and / or its parent company, Defendant Carnival Corporation. **Princess Cruise Lines Ltd**. may be served with process in this matter by serving its registered agent for the service of process, **CT Corporation System, 818 W. 7th Street, Suite 930, Los Angeles California, 90017**.

## II.
### JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Plaintiff William Smedley and Defendants CARNIVAL and PRINCESS, and Plaintiff seeks damages in excess of $1,000,000 (One Million Dollars) exclusive of interest, costs, and attorneys' fees, which greatly exceeds the minimum amount of controversy required by § 1332.

5.      Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 and § 1333, as aspects of this case involve maritime torts.

6.      The Court has personal jurisdiction over PRINCESS as PRINCESS's principal place of business is located in Los Angeles County, California. Additionally,

2

PRINCESS conducts substantial business within the state of California, including operating cruises from ports in San Francisco, San Diego, and Los Angeles. PRINCESS markets cruise vacations to California residents and employs thousands of California residents to work at its California headquarters.  It was foreseeable at all times that PRINCESS could be hailed into court in the State of California for conduct that caused injuries; in fact, PRINCESS's Passenger Contract requires claimants like Plaintiffs in this action, to bring suit to vindicate personal injury claims in the United States District Court for the Central District of California.  At all times hereto, PRINCESS owned and operated the cruise ship the Grand Princess.  Plaintiff was a passenger aboard the Grand Princess that departed out of San Francisco on February 21, 2020, and was anchored off the coast of San Francisco from March 4-9, 2020, as a result of an outbreak of COVID-19.   The exercise of personal jurisdiction over PRINCESS by this Court comports with due process and is consistent with traditional notions of fair play and substantial justice.

7.    Further, the Court has personal jurisdiction over CARNIVAL as, although it is a foreign corporation, it has specifically applied for and been granted authorization to do business within the State of California, and by way of its own operations involving the ports of the State of California, as well as by and through the operations of its subsidiary, PRINCESS, CARNIVAL is, for jurisdictional purposes, essentially "at home" in the State of California, by and through its own operations as well those of its wholly owned subsidiary PRINCESS.

a. Carnival has confirmed in filings with the Securities and Exchange Commission ("SEC") that it wholly owns Princess as a subsidiary and serves as the parent company for Princess. Carnival refers to Princess as a "Carnival Brand" cruise line and "part of our growing business," and one of several "operating lines that together comprise the "Carnival Group" of companies.

b. Carnival exercises organizational control over Princess. Carnival has placed Princess under its Holland America Group, which Carnival owns

PLAINTIFF'S ORIGINAL COMPLAINT

and controls. In April 2003, Carnival merged with P&O Princess Cruises plc. This merger brought the Princess, P&O Cruises, P&O Cruises Australia, AIDA Cruises, Ocean Village, and Swan Hellenic cruise lines within the Carnival family of corporations.

c. Carnival and Princess share the same Board of Directors and almost all of the same executive officers and appear to use the same assets.

d. Carnival and Princess do not compete freely with each other, but coordinate operations, sales, and marketing so as to mutually benefit and protect each other.

e. Carnival controls Princess' business and day-to-day operations. Carnival monitors and supervises environmental, safety, security, and regulatory requirements for Princess and makes decisions affecting those requirements on behalf of Princess.

## III.
### FACTUAL BACKGROUND

8. An estimated 30 million passengers are transported on approximately 300 cruise ships worldwide each year.

9. Cruise ships bring individuals from diverse backgrounds into close proximity with each other for many consecutive days.

10. It has long been known within the cruise line industry that "The proximity of passengers and crew members in a semi-enclosed environment, with interactions in the dining halls, recreational rooms, spas, and pools" on cruise ships creates a unique environment for the person-to-person transmission of microbes[1] and infectious diseases[2].

11. Defendants' *Diamond Princess* cruise ship is 952 feet long, 123 feet wide, and 205 feet tall; during a cruise, approximately 3,700 people are confined in that space for multiple days at a time.

---

[1] "SARS-CoV-2 *Shedding and Seroconversion Among Passengers Quarantined After Disembarking A Cruise Ship: A Case Series.*" *The Lancet. Infectious diseases*, S1473-3099(20)30364-9. 12 Jun. 2020, doi:10.1016/S1473-3099(20)30364-9;
[2] Center for Disease Control and Prevention, *Weekly Mortality and Morbidity Report*, No. 69(March 27, 2020).

PLAINTIFF'S ORIGINAL COMPLAINT

12.  Carnival had for all times relevant a health and medical system used by its ships, including those sailed under the "Princess" cruise line name, and including specifically the *Diamond Princess*. The system covers over 102 ships and 12 million guests annually.

13.  The system is responsible for a clinical staff of over 800 full-time doctors, nurses and paramedics who deliver care within the medical centers onboard 70 cruise ships sailing on international itineraries, including the *Diamond Princess*.

14.  Carnival administers and controls this system, and it is ultimately carried out by physicians and nurses and other medical personnel aboard the ships.

15.  Dr. Grant Tarling ("Tarling"), Carnival's Group Senior Vice President and Chief Medical Officer, was, for all times relevant to this litigation, responsible for developing and implementing research-based public health policies and procedures that protected Carnival and princess cruise ship passengers, including Plaintiffs and other *Diamond Princess* passengers.

16.  Tarling was also involved in the development of virus prevention and control measures on the cruise ships owned and / or sailed by Carnival / Princess, including the *Diamond Princess*.  Tarling is, and for all times relevant was, involved in the operation of Carnival's health and medical system, ands that which was in place aboard the Diamond Princess at all times related to this litigation.

17.  At all times relevant, Carnival's health and medical system were relied upon by the *Diamond Princess* and its passengers to identify actual and/or potential health and safety risks. Tarling and other Carnival personnel were, for all times relevant, responsible for implementing procedures, policies, protocols, and operational changes on board the *Diamond Princess* during Plaintiff's cruise. This included responding to viral outbreaks. Carnival's health and medical system was used to obtain information about actual and/or potential health and safety threats that posed a risk to the crew and passengers on board the *Diamond Princess* for all times relevant.

/ / /

5

PLAINTIFF'S ORIGINAL COMPLAINT

18.  Carnival's Health and Medical System was responsible for communicating with its numerous health, safety, and sanitation vendors throughout the world regarding actual and/or potential health and/or safety concerns that posed a risk to *Diamond Princess* crew and passengers, and monitoring its communications continuously so as not to create delays in responding to critical information concerning potential and/or actual threats to passenger health and/or safety.

19.  Carnival's health and medical system was responsible for evaluating information about actual and/or potential health and safety threats, including viral outbreaks, and assessing the risk to cruise crew and passengers, including the risk posed to the crew and passengers on the *Diamond Princess*.

20.  Carnival's health and medical system was responsible for communicating potential and/or actual health risks to *Diamond Princess* medical personnel, officers, administrative personnel, and crew.

21.  Carnival's health and medical system was responsible for communicating potential and/or actual health risks to Princess' onshore administrative and management personnel.

22.  Carnival was responsible for immediately passing along to Princess personnel and/or *Diamond Princess* personnel information concerning health and/or safety threats from any and all sources.

23.  Carnival's health and medical system was responsible for advising *Diamond Princess* passengers of actual and/or potential health and/or safety risks.

24.  Carnival's  health and  medical  system was responsible for formulating procedures, protocols, operational changes, and plans to address actual and/or potential risks to the health and/or safety of *Diamond Princess* passengers.

25.  Carnival's health and medical System was responsible for communicating protocols, procedures, operational changes, and/or directives to the *Diamond Princess* to avoid and/or minimize actual or potential health risks to its passengers and crew.

/ / /

PLAINTIFF'S ORIGINAL COMPLAINT

26.  Carnival's health and medical system was responsible for advising Carnival and Princess customers of the actual and/or potential health and/or safety risks and providing recommendations and directives concerning how to minimize sickness and injury on board Carnival and Princess cruise ships.

27.  Carnival's health and safety system was responsible for ensuring that the *Diamond Princess* adopted new protocols, procedures, or plans, or itineraries, and/or made adjustments to the *Diamond Princess'* existing protocols, procedures, plans, operations, and/or its itinerary as needed, to ensure the health and safety of its passengers and crew.

28.  Carnival had operational control over the *Diamond Princess* cruise in issue, including the ability to cancel and/or alter the itinerary of the cruise. Carnival regularly communicated with *Diamond Princess* personnel during its cruise.

29.  Carnival had the duty to make changes to the *Diamond Princess'* itinerary to prevent unreasonable illness, injury, or harm to its passengers.

30.  Carnival made decisions regarding the ship's personnel, policies, and procedures, and those decisions were adopted by the *Diamond Princess*. Carnival had the duty to make changes to the *Diamond Princess'* personnel, policies, and procedures to prevent unreasonable illness, injury, or harm to its passengers.

31.  Carnival had the ability, authority, and duty to adopt, change, or remove precautionary practices regarding the health and safety of the cruise.

32.  Carnival's operational staff was responsible for addressing health risks to Carnival cruise line passengers, including passengers on the *Diamond Princess*.

33.  Specifically, Carnival's operational staff was responsible for interacting with various governmental agencies regarding cruise itinerary changes, quarantine procedures, and docking options.

34.  For years, defendants were aware that viruses on cruise ships spread quickly and thoroughly and had the ability to infect a substantial portion of a ship's population within days.

/ / /

PLAINTIFF'S ORIGINAL COMPLAINT

35.  Domestically, defendants and other cruise lines are required to comply with the Centers for Disease Control's ("CDC") Vessel Sanitation Program, which tracks gastrointestinal outbreaks affecting 3% or more of a ship's crew and passengers.

36.  Between 2010 and 2020, Princess Cruises experienced 26 ship-wide outbreaks that affected at least three percent of the passengers.

37.  Nonetheless, even though defendants' ships have life boats, life jackets, fire prevention equipment, and emergency procedures, these Defendants provide no such personal protective equipment or training sessions for viral outbreaks, despite the fact that outbreaks have caused more illness and injury on defendants' vessels than fire or shipwrecks during the last 20 years.

38.  SARS-CoV-2, the virus that causes coronavirus disease (COVID-19), was first identified in Wuhan, China, in December of 2019 and has since spread worldwide to approximately 190 countries and territories.

39.  COVID-19 posed a risk for the rapid spread of illness on cruise ships, requiring aggressive efforts to contain that spread.

40.  The COVID-19 outbreak that occurred during Defendants' January 2020 Diamond Princess cruise was foreseeable, and the spread of the virus as it occurred on the *Diamond Princess* was preventable.

41.  On January 20, 2020, the *Diamond Princess* departed Yokohama, Japan, for a 15-day cruise covering a region near the epicenter of the COVID-19 pandemic. Within five days, a symptomatic passenger departed the ship in Hong Kong and tested positive for a SARS-CoV-2 infection. Although infections accumulated on the *Diamond Princess* thereafter, the ship completed its cruise with few or no measures taken to slow the growing outbreak on board. Defendants ignored reasonable warnings and failed to take reasonable precautions to prevent the spread of COVID-19 on the *Diamond Princess.* As a result, more than 700 passengers and crew members eventually would be infected with the virus, and at least ten would die.

/ / /

8

42.   Because of the lack of proper screening, on January 6, 2020 an individual was allowed to board the *Diamond Princess* in Singapore who was infected with COVID-19 (hereafter the "Index Patient"), this passenger was allowed to travel freely aboard the ship, although he was experiencing symptom consistent w/ the COVID-19 virus, until he was allowed to disembark on January 25th, 2020 in Hong Kong where he sought medical treatment at a hospital.

43.   Subsequent to the disembarking of the Index Patient, other passengers and crew members, including food service staff, began experiencing COVID-19 symptoms aboard the Diamond Princess. Patient 2 would remain on the ship until the ship docked in Yokohama on February 4.

44.   Passengers were never given the identity of the individuals or told that there were passengers or crew on the ship who had been experiencing these symptoms.

45. On January 25, 2020, several other significant things occurred, including the docking of the Diamond Princess in Hong Kong, where the staff and crew of the ship encouraged passengers to disembark and enjoy the city. Defendants made no effort to test or screen for infection or illness when passengers returned to the *Diamond Princess*. In an effort to minimize the concern of infection, defendants falsely told passengers that the town was quiet "because of the Chinese New Year."

46. In spite of their knowledge of the spreading of the COVID-19 virus in the area and the fact that a passenger had just disembarked with symptoms consistent with his having the COVID-19 virus, on January 26, 2020, the *Diamond* Princess continued its voyage, sailing south along the Chinese coast, to Vietnam, while making no changes to the manner in which food was served or delivered and without taking other steps to minimize the spread of onboard illness. Passengers were not notified of any enhanced risk or asked to take precautions on their own.  No masks or gloves were provided to passengers or used by crew members interacting with passengers.  Passengers were encouraged to mix with locals in Vietnam, fellow passengers, and crew members.

/ / /

9

47. On January 27, 2020, as reported by Jonathan Levin, reporter for Bloomberg, Carnival indicated relative to the COVID-19 virus: "Although the risks to our guests, crew and business around the world is very low, we are closely monitoring the situation."

48. On January 31, 2020, the *Diamond Princess* docked in Keelung, Taiwan, approximately 750 miles east of Wuhan. By that time, it was estimated that approximately 75,000 people in Wuhan were infected with COVID-19. WHO declared a global health emergency. The United States declared a public health emergency. U.S. citizens who had been in China's Hubei Province during the prior 14 days were subject to two weeks of mandatory quarantine. Major airlines suspended flights to and from mainland China. Within days, Taiwan's Health Authority would ban all international cruise ships, in part because of the *Diamond Princess*'s passengers' exposure to the local community.

49. By contrast, defendants' activities personnel encouraged passengers aboard the Diamond Princess to travel from the port on the subway to Taipei to sightsee. Defendants did not provide or recommend any health precaution.

50. On February 1, 2020, the *Diamond Princess* arrived at the port in Naha, in the Okinawa Prefecture in Japan. Again, Passengers from the *Diamond Princess* were encouraged to disembark and to travel through town without restrictions.

51. No health screening occurred when the passengers returned to the ship.

52. Also, after passengers returned to the ship, Defendants did not take additional safety precautions to reduce the spread of the virus, food continued to be offered in the buffet and restaurants, entertainment was offered throughout the ship, and passengers and crew members mingled without precaution in close quarters.

53. At this time in a hospital in Hong Kong, Index Patient tested positive for COVID-19.

54. The Hong Kong Department of Public Health informed the defendants', by and through the crew of the *Diamond Princess,* that the Index Patient tested positive.

55. On or about February 1, 2020, a vendor contracted by Carnival informed Carnival that a former passenger on the *Diamond Princess* had been treated for Covid-

10

PLAINTIFF'S ORIGINAL COMPLAINT

19.

56. After February 1, 2020, Carnival was kept informed of key operational facts concerning the *Diamond Princess* on a daily basis. These updates included developments concerning the coronavirus outbreak.

57. Carnival and Princess personnel together determined how to respond to the coronavirus outbreak, and at any time after learning of the COVID-19 outbreak in the region, Carnival and or Princess could have:

a. altered, changed, or ended the *Diamond Princess* cruise early, but they did not;

b. adopted additional sanitation or cleaning measures or precautions on board the ship, but they did not;

c. altered the procedures used to feed passengers, including how to prepare, store, transport, and/or deliver food, but they did not;

d. adopted and enforced effective social distancing guidelines, but they did not; provided *Diamond Princess* passengers with additional information about the coronavirus on board and at the locations where the ship docked during the cruise, but they did not;

e. adopted more stringent procedures to ensure that the virus was properly contained, but they did not;

f. adopted more stringent embarking procedures to ensure that the coronavirus was not brought on board, but they did not;

g. provided additional medical personnel to the *Diamond Princess*, but they did not;

h. initiated effective measures to disinfect the *Diamond Princess* common areas, but they did not;

i. prevented false assurances that comingling, shore excursions, and their social dining and entertainment offerings were safe, but they did not;

j. adopted testing procedures for its staff and passengers, but they did not.

11

PLAINTIFF'S ORIGINAL COMPLAINT

58.    On February 2, 2020, Tarling confirmed with Hong Kong health officials the existence of the virus on the *Diamond Princess* in an email with the subject heading, "Confirmed Coronavirus Case."

59.    By February 2, 2020, Defendants Princess and Carnival did not announce officially or directly to passengers of *Diamond Princess* that there was a confirmed case on COVID-19 onboard.

60.    Prior to this, Carnival was aware that there had been a coronavirus scare aboard one of its ships near Italy, and a second in mid-February on another Carnival cruise in Asia.

61.     Prior to the cruise, Tarling was aware of, and had participated in, a study and/or article that acknowledged that cruise ships represented a potential source for the introduction of virus strains to the United States and that the close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation increase the risk of communicable disease transmission.

62.    On February 2, 2020, crew members of the *Diamond* Princess are known to have been reporting symptoms of the Covid virus.

63.    As of February 3, 2020, Defendants Carnival and Princess were informed actually and / or constructively by experts in the European Union of the risks of COVID-19 and the recommended response protocols to the cruise industry. Protocols included quarantine passengers in their cabins.

64.    On February 3, 2020, the *Diamond Princess* arrived back in Yokohama, Japan. Unbeknownst to the passengers, crew members reported having fevers. Defendants still failed to take additional safety precautions to reduce the spread of the virus. The *Diamond Princess* failed to implement preventative action such as issuing a stay-at-room order.

65.    On February 4, 2020, passengers were scheduled to disembark from the Diamond Princess, instead their luggage was returned to their cabins and defendants advised passengers that the cruise had been extended for an additional day.

PLAINTIFF'S ORIGINAL COMPLAINT

66.    During the next 24 hours, the ship's passengers and crew mingled without restriction. The pool, bars, entertainment, and dining services were all open. Lunch and dinner were served in the usual, communal fashion. After dinner, hundreds of passengers crowded onto the vast promenade deck and its surrounding staircases, inches apart, listening to a classical music performance.

67.    Unbeknownst to the passengers, the Japanese government had locked down the ship for 24 hours, a minimum of ten people on board had tested positive for COVID-19, and sick crew members had been taken off the ship.

68.    Despite the imminent health risk, bottled water was provided only to those passengers who paid $3.00 a bottle or $75.00 a day for the "beverage package."

69.    Finally, on February 5, 2020, the Defendants announced that all passengers on the Diamond Princess were being quarantined in their cabins.

70.    Crew members continued to perform food service duties, delivering meals to passengers, and the meals were plated, utensils were not sterile, and beverages were served in open glasses.

71.    On or about February 5, 2020, Carnival CEO Arnold Donald ("Donald") took personal control over the outbreak and was involved in situation updates. Donald made decisions that directly and indirectly contributed to the manner in which passengers were quarantined, fed, housed, and kept safe.

72.    By February 6, 2020, the number of infected individuals on the ship rose to 41, and Plaintiffs were finding it difficult to take safety measures to reduce the risk of contracting the virus.

73.    Because the quarantine prevented movement within the ship, air in the passage ways and inside cabins became a concern.

74.    It has been reported that between February 7 and February 23, 2020, while the ship was docked with quarantined passengers on board, the *Diamond Princess* contained the largest cluster of COVID-19 cases outside mainland China, and that transmission largely occurred among passengers before quarantine was implemented.

13

PLAINTIFF'S ORIGINAL COMPLAINT

75.     Among the 3,711 *Diamond Princess* passengers and crew, 712 would eventually have positive test results for SARS-CoV-2. Of these, 331 were asymptomatic at the time of testing.

76.     On February 8, 2020, the U.S. Embassy and CDC sent a letter to the *Diamond Princess* Passengers and Cruise Members explaining how COVID spreads and providing protocols to prevent future infections. These protocols included staying in your rooms, social distancing, cleaning hands, and wearing a facemask.

77.     On February 8, 2020, another six COVID-19 cases were found on board. Cruise management did not test crew members, but instead relied upon crew members—many of whom could not afford to lose their jobs—to admit being sick on a questionnaire. Thirty crew members admitted having fever; 20 of those were food service workers. Defendants continued to deliver food to passengers in unsanitary conditions, providing beverages and meals in unsealed glasses, on open plates, and with non-sterile utensils.

The food continued to be delivered on carts by crew members not wearing gloves or masks.

78. On February 12, 2020, Carnival issued an update on its financial condition and the impact of the coronavirus. Carnival stated "Carnival Corporation & P L C is closely monitoring the evolving situation with respect to Coronavirus. The safety of guests and employees, compliance and protecting the environment are top priorities for the company.  The company's medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement enhanced screening, prevention and control measures for its guests, crew and ships."

79. Plaintiffs reasonably relied upon Carnival's health and medical system during their cruise to protect them from unreasonable risks of injury and/or illness.

80. As a consequence of Princess and Carnival's negligence, Plaintiff William Smedley has been harmed.

81.     Relative to his exposure to the COVID 19 virus while on the Defendants'

14

PLAINTIFF'S ORIGINAL COMPLAINT

*Diamond Princess* cruise, Plaintiff William Smedley had been healthy and symptom free when he boarded the Diamond princess on January 6, 2020.

82.    In spite of the fact that the "Corona Virus" (as it was referred to at the time) was known to have been in China, the Defendants allowed the passengers who boarded the *Diamond Princess* in Singapore on January 6, 2020 to do so without any health screening. It has since been learned that the "Index Patient" boarded the Diamond Princess on January 6th.

83.  Mr. Smedley's only known potential exposure to the Covid-19 virus was on board the *Diamond Princess*, where he was allowed to unknowingly freely mingle with other passengers aboard the ship, some of whom were sick, at times when the crew of the ship were aware that people on the ship were getting ill with symptoms consistent with Covid-19.

84.  Mr. Smedley has since learned that one of his own waiters and matre'ds  for food service eventually tested positive for the COVID-19 virus, and he was aware during the time that he was in quarantine aboard the ship that one of his food servers during the time his quarantine had to be replaced due to illness.

85.    While on board the Diamond Princess, and certainly before disembarking, Mr. Smedley began to experience significant headaches, extreme lethargy, and extreme anxiousness and anxiety, none of which he had ever experienced prior to boarding the Diamond Princess.

### CLAIMS FOR RELIEF
### IV.
### NEGLIGENCE

86.    Plaintiff re-alleges all allegations in paragraphs 1 through 85 above as if alleged fully herein.

87. Prior to and during plaintiffs' January 20, 2020 cruise on Defendants' *Diamond Princess* ship, Carnival and Princess owed plaintiffs a duty to ensure that Plaintiff William Smedley was not exposed to an unreasonable risk of harm that

15

Defendants knew, or should have known, about.

88. As a result of Carnival and Princess' conduct, plaintiff was at actual risk of immediate physical injury and/or were actually injured.

89. Both Defendants Carnival and Princess knew or should have known that ships are susceptible to the spread of viruses and that, as a result, failure to take appropriate measures to prevent, stall, or contain viruses was likely to cause injury.

90. Both Defendants Carnival and Princess knew or should have known that, because of their failure to take such measures prior to and during plaintiff's cruise, a virus was permitted to spread throughout the ship, infecting plaintiffs and others, well before the ship was quarantined on or about February 5, 2020.

91. Both Defendants Carnival and Princess breached their duty of care to Plaintiff by failing to take appropriate steps to prevent, stall, or contain the spread of airborne and respiratory illnesses, including failing to have their employees distribute food while wearing masks and/or gloves, failing to provide sealed, sterile eating utensils, failing to have or provide passengers with bottled water, and/or failing to provide food in sealed, sterile containers.

92. Carnival breached its duty of care to plaintiffs by failing to instruct Princess to take appropriate steps to prevent, stall, or contain the spread of airborne and respiratory illnesses, including failing to have their employees distribute food while wearing masks and/or gloves, failing to provide sealed, sterile eating utensils, failing to have or provide passengers with bottled water, and/or failing to provide food in sealed, sterile containers.

93. Both Defendants Carnival and Princess further breached their duty of care to Plaintiff William Smedley by failing to provide passengers with training, including instructional drills advising passengers on proper procedures for limiting exposure to viruses, by falsely advising plaintiff and other passengers aboard the *Diamond Princess* that "everything is fine" and/or withholding information that could have induced social distancing and slowed the spread of the virus, by failing to prevent the mingling of

PLAINTIFF'S ORIGINAL COMPLAINT

sick and healthy individuals on board, and by promoting social gatherings by continuing communal dining and entertainment even after it was known that crew members and/or passengers had tested positive for COVID-19.

94. Defendants did so in part because these actions created opportunities to increase revenue through the sale of entertainment, goods, and consumables.

95. Carnival also further breached their duty of care to Plaintiff by failing to instruct Princess to provide passengers of the *Diamond Princess* with training, including instructional drills advising passengers on proper procedures for limiting exposure to viruses, by falsely advising plaintiffs that "everything is fine" and/or withholding information that could have induced social distancing and slowed the spread of the virus, by failing to prevent the mingling of sick and healthy individuals on board, and by promoting social gatherings by continuing communal dining and entertainment even after it was known that crew members and/or passengers had tested positive for COVID-19.

96. Both Defendants Carnival and Princess further breached their duty of care to Plaintiff by failing to distribute masks, gloves, and other personal protective equipment, failing to provide adequate COVID-19 tests or temperature screenings to crew members and passengers, and/or failing to provide other measures to limit plaintiffs' exposure to infected passengers and crew members.

97. Carnival breached its duty of care to Plaintiff by failing to instruct Princess to distribute masks, gloves, and other personal protective equipment, failing to provide adequate COVID-19 tests or temperature screenings to crew members and passengers, and/or failing to provide other measures to limit plaintiffs' exposure to infected passengers and crew members.

98. Both Defendants further breached their duty of care to Plaintiff by refusing to gather appropriate information regarding passengers' and crew members' symptoms. Defendants did so in part so that they would not be required to report the outbreak formally.

99. Both Defendants further breached their duty of care to Plaintiff by failing

17

to encourage crew members to disclose illnesses, including symptoms of COVID-19. Defendants knew or should have known that many of their crew members were low-paid individuals without health insurance who were highly dependent upon the salaries and living quarters defendants provided. Crew members who were ill were sent home. Defendants knew or should have known that crew members were financially motivated not to disclose illnesses, including symptoms of the COVID-19 virus.

100.    Both Defendants further breached their duty of care to Plaintiff by failing to take precautions in ports of call, by promoting and selling excursions and day trips that immersed some *Diamond Princess* passengers in exceptionally dense local communities, by failing to screen or test passengers and crew members returning from such excursions and trips, and/or by failing to reduce the ability of infected individuals to come on board during the cruise.

101.    Both Defendants further breached their duty of care to Plaintiff by failing to end the cruise prior to its termination date and/or by failing to provide passengers with the option of leaving the cruise early without financial loss.

102.    Both Defendants further breached their duty of care to Plaintiff by engaging in a disinformation campaign designed to downplay and/or hide COVID-19 exposure on their cruises. Because of defendants' failure to disclose and/or intentional withholding of information about the virus on the *Diamond Princess*, Plaintiff William Smedley was prevented from mitigating his own injury and their risk of harm. This campaign continued well after the *Diamond Princess* was quarantined, despite the fact that passengers on defendants' *Grand Princess* became ill on its February 21, 2020 cruise to Hawaii.

103.    The *Grand Princess* immediately embarked on a subsequent cruise to Hawaii, and that resulted in an outbreak of additional cases of COVID-19 sufficient to result in a quarantine. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. Defendants refused to cancel the cruise in part because doing so would prompt passenger cancellations on other cruises.

18

PLAINTIFF'S ORIGINAL COMPLAINT

104.     As a proximate result of defendants' negligent, willful, knowing, and/or intentional conduct, Plaintiff William Smedley has sustained and continue to sustain substantial losses of earnings and other employment benefits.

105.     As a proximate result of Defendants' negligent, willful, knowing, and/or intentional conduct, Plaintiff William Smedley has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage in a sum according to proof.

106.     As a proximate result of Defendants' negligent, willful, knowing, and intentional conduct, Plaintiff William Smedley has incurred and continue to incur legal expenses and attorneys' fees in a sum according to proof.

107.     Defendants' intentional and/or tortious conduct was committed intentionally, in a malicious, oppressive, and/or fraudulent manner.

108.     Further, Defendants' tortious actions were carried out, authorized, and/or ratified by a managing agent or vice principals of the Defendants. This entitles Plaintiff to punitive damages.

109.   As a direct and foreseeable result of the aforementioned negligence of Carnival and Princess in exposing Plaintiff to actual risk of immediate physical injury, Plaintiff has suffered from bodily injury and/or emotional distress from COVID-19 exposure as he sat minute after minute in his confined cabin on an infected vessel, as he continued to sit in additional quarantine on land, and after he left quarantine. This bodily injury and/or emotional harm will continue to plague him.

110.   WHEREFORE, Plaintiffs demand judgment against Defendants Carnival and Princess for damages suffered as result of their negligence and a trial by jury on all issues triable.

## V.
## GROSS NEGLIGENCE

Plaintiffs re-allege all allegations set out in paragraphs 1 through 110 above as if alleged fully herein.

19

PLAINTIFF'S ORIGINAL COMPLAINT

111.   Defendants Carnival and Princess's conduct in deciding to continue to sail the *Diamond Princess* with Plaintiff and other passengers aboard, knowing that the ship was travelling in a region in which the virus was a concern and with knowledge that there were passengers and crew members on board who had symptoms of the virus , shows a lack of any care on the part of Defendants Carnival and Princess, amounting to gross negligence.

112.   Moreover, Defendants Carnival and Princess's conduct in failing to warn Plaintiff of his actual risk of harm in being exposed to COVID-19, in light of their knowledge of other sick passengers and crew on board the vessel, amounts to an extreme departure of a what a reasonably careful cruise line would do.

113.   Defendants Carnival and Princess chose to place profits over the safety of its passengers, crew, and the general public in continuing to operate business as usual, despite their knowledge of the actual risk of injury to Plaintiffs.

114.   WHEREFORE, Plaintiff demand judgment against CARNIVAL and PRINCESS including punitive damages suffered as a result of the gross negligence of CARNIVAL and PRINCESS, and a trial by jury on all issues triable.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment against Defendants as hereinafter set forth:

a.    For compensatory and general damages in an amount according to proof;

b.    For past and future medical, incidental, and service expenses according to proof;

c.    For past and future mental anguish;

d.    For punitive damages to be awarded according to proof;

e.    For pre- and post-judgment interest on all damages as allowed by the law;

f.    For costs of suit incurred herein;

g.    For attorney fees under existing law; and

PLAINTIFF'S ORIGINAL COMPLAINT

h.      For such other and further relief as the Court may deem just and proper.

## VII.
### JURY DEMAND

The Plaintiffs hereby demand trial by jury of all issues so triable.


Dated: January 5, 2021                              SINGLETON LAW FIRM, APC

                                                    By:    */s/Gerald Singleton*
                                                           Gerald Singleton
                                                           Attorneys for Plaintiffs

PLAINTIFF'S ORIGINAL COMPLAINT